UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

RICHARD PRIMEAUX,

    Plaintiff,

v.                                            Case No:  2:20-cv-941-JLB-NPM

PROGRESSIVE AMERICAN INSURANCE
COMPANY,

    Defendant.

## ORDER

Richard Primeaux and three other passengers were in a car accident. The driver was insured by Progressive American Insurance Company ("Progressive"). After Progressive investigated the passengers' injuries, it allocated each passenger a portion of the policy's bodily injury limits. Mr. Primeaux was allocated most of the available coverage. He sued the driver and received an excess judgment. Now, he sues Progressive, arguing it did not handle his claim in good faith, which resulted in that excess judgment. Progressive moves for summary judgment arguing it did not act in bad faith in resolving multiple claims against its insured. Alternatively, it argues that Mr. Primeaux refused to settle for the policy limits anyway and Progressive therefore did not contribute to his excess judgment. But these material facts are genuinely disputed. And there is sufficient evidence from which a reasonable jury could find that Progressive did not act in its insured's interest by resolving Mr. Primeaux's claim as it did. Thus, its motion for summary judgment (Doc. 44) is **DENIED**.

## BACKGROUND[1]

On September 29, 2017, Mr. Primeaux—along with Nashoba Gonzalez, Corbin Billie, and Yamil Silva—were injured in a car accident. (Doc. 44 at 2, ¶ 1.) Callie Star Joe was driving, and the vehicle was insured by Progressive. (Id.; Doc. 45-2.) Her policy's bodily injury limits were $10,000 per person and $20,000 per accident. (Doc. 45-2 at 2.) Progressive first learned of the accident on October 5, 2017 when Ms. Gonzalez's counsel contacted it and provided a summary of her injuries. (Doc. 45-3 at 22–23.) The next day, Progressive claims specialist Bjoern Styra reviewed Ms. Joe's policy and began gathering information about the accident. (Id. at 20–21.)

Mr. Styra could not contact Ms. Joe because the phone number he had for Ms. Joe was not in service. (Doc. 45-3 at 19.) On October 6, 2017, Mr. Styra sent Ms. Joe a letter and an email seeking to discuss the accident and her policy's coverage. (Docs. 44-6, 45-5.) He also sent Ms. Joe a letter explaining the passengers' injuries may exceed her coverage limits and that she would have to pay any difference. (Doc. 45-6.) On October 20 and 23, Mr. Styra was instructed to contact the passengers and determine the nature of their injuries. (Doc. 45-3 at 12–13.)

---

[1] Mr. Primeaux admits or partially admits to all of Progressive's Statement of Material Facts. (Doc. 48 at ¶¶ 1–31.) That said, certain "admissions" contain caveats, further explanation, or dispute certain assertions. (See, e.g., id. at ¶¶ 27–28.) Mr. Primeaux also cites record evidence in support of his factual interpretations. All facts are viewed in a light most favorable to Mr. Primeaux, the non-moving party.

Progressive opened an official claims file for the incident on October 24, 2017. (Doc. 44-12 at 84.)

Eventually, Mr. Styra and Ms. Joe spoke on October 27, 2017. (Doc. 44-12 at 79.) Mr. Styra explained Ms. Joe's coverage, her liability if the claims exceeded that coverage, and that the mail he sent her had been returned as undeliverable. (Id.) Ms. Joe provided Mr. Styra a corrected address and information about the passengers' injuries. (Id.) Ms. Gonzalez, Ms. Joe's cousin and passenger in the vehicle, had a tooth knocked out, sustained a concussion, and experienced a seizure at the hospital requiring medication. (Id.) Mr. Billie, Ms. Joe's boyfriend at the time, lacerated and fractured his neck, fractured his ribs, and had a knee injury. (Id.) He did not require surgery and spent one day at the hospital. (Id.) Ms. Joe explained that Mr. Primeaux sustained a lumbar fracture and received surgery and stayed at the hospital for two days. (Id.) Finally, Ms. Joe stated that Mr. Silva "apparently was fine" and "was checked out and released at the hospital." (Id.) Given the nature of the injuries, Mr. Styra told Ms. Joe Progressive likely would pursue a global settlement offer with the passengers given the minimal policy limits and multiple, serious injuries. (Id.) Ms. Joe told Mr. Styra that she was unable to contribute any money toward a settlement. (Id. at 78.)

On November 1 and 8, 2017, Progressive sent Mr. Primeaux letters asking to speak with him about the accident and to resolve his claim. (Docs. 45-13, 45-14.) On November 13, Progressive received a letter of representation from Mr. Primeaux's counsel. (Doc. 44-18.) On November 29, Mr. Primeaux's counsel sent

Progressive a copy of Mr. Primeaux's hospital discharge sheet. (Doc. 44-20.) Mr. Primeaux was diagnosed with a "[c]losed head injury; Motor vehicle accident; T12 vertebral fracture." (Id. at 2.) Progressive manager Nicholas DiPasquale confirmed receipt of the report on December 8, 2017, noting it was the only non-verbal information about the passenger's injuries (i.e., records) that Progressive had received thus far. (Doc. 44-12 at 77; Doc. 44 at 6–7, ¶ 13.) Mr. DiPasquale then suggested a global settlement conference considering the severity of the injuries and approved Progressive referring the matter to outside counsel. (Doc. 44-12 at 77.) Progressive referred the matter to attorney David Chaiet on December 12. (Id. at 76.) On December 13, Progressive closed its file as to Mr. Billie because of inactivity and the lack of communication between the two. (Doc. 45-3 at 1–2.) Unbeknownst to Progressive, Mr. Primeaux and his counsel began preparing to sue Ms. Joe on December 15, 2017. (Doc. 44 at 7, ¶ 15; Doc. 44-23.) Neither Progressive nor Mr. Primeaux had made a settlement offer at the time. (Doc. 44 at 7, ¶ 15; Doc. 48 at 10–11, ¶ 15.)

On December 20, 2017, Progressive sent the passengers and counsel a letter explaining that it was prepared to "tender our full policy limit of $20,000." (Doc. 45-18.) The letter scheduled a global settlement conference for January 15, 2018, urging the participation of all claimants. (Id. at 2.) If the passengers could not agree how to divide the $20,000, Progressive informed them that it would "seek to resolve claims in a manner that protects" Ms. Joe's "best interest." (Id.) Mr. Chaiet sent a similar letter to the passengers and their counsel on December 26.

(Doc. 45-19.)  Again, Progressive noted it was offering the $20,000 limit and urged a "mutually agreeable distribution of the settlement proceeds."  (Id. at 2.)  Mr. Chaiet also requested "all medical records and bills . . . so that [Progressive could] review and evaluate [the passengers'] claim[s]."  (Id.)  Mr. Primeaux authorized his counsel to sue Ms. Joe around December 27, 2017.  (Doc. 44-29.)  Mr. Primeaux's counsel did not receive Progressive's letters about the global settlement conference until December 28.  (Doc. 44-32 at 1.)

On January 11, 2018, four days before the global settlement conference, Progressive learned that Mr. Primeaux had received $5,500 from his parents' policy with Progressive but that he had $80,000 in medical bills.  (Doc. 44-12 at 75.)  That same day, Mr. Styra contacted Mr. Primeaux's counsel to see whether he and Mr. Primeaux would attend the conference.  (Id. at 74.)  Mr. Styra could not reach counsel and left a message with an assistant requesting their attendance and any additional records they may have about Mr. Primeaux's injuries.  (Id.)

On January 12, Progressive received a $10,000 settlement demand from Ms. Gonzalez's counsel.  (Doc. 44-35.)  The letter summarized her injuries as "head trauma resulting in four stitches; she also suffered a grand mal seizure while in the hospital.  Ms. Gonzalez also sustained a gash on her left arm which required five stitches and lost her right front tooth."  (Id. at 1.)  Ms. Gonzalez spent four days in the hospital and the letter included a lien for $59,613.46.  (Id. at 4.)  Ms. Gonzalez was prepared to file a lawsuit seeking an excess judgment if she did not hear back from Progressive within twenty-one days.  (Id. at 3.)

On January 15, 2018, the morning of the global settlement conference, Mr. Styra managed to call Mr. Billie. (Doc. 44-12 at 73.) Mr. Styra told Mr. Billie that the conference was occurring that afternoon and Mr. Billie stated he had not received Progressive's correspondences. (Id.) Mr. Billie then summarized his injuries. (Id.) He spent four days in the hospital with a neck fracture, rib fractures, and torn MCL but received no follow-up care after he was discharged. (Id.) Mr. Billie agreed to participate in the conference via telephone. (Id.) Mr. Styra asked Mr. Billie if he could help in contacting Mr. Silva and Ms. Joe as he had not heard from them. (Id.) Mr. Billie responded that while Mr. Silva did not seem injured, he would contact Ms. Joe on Mr. Styra's behalf. (Id.)

The global settlement conference was held on January 15, with Mr. Chaiet, Mr. Styra, and mediator Isabelle Cavanagh appearing in person. (Id. at 71.) Ms. Gonzalez's counsel and Mr. Billie attended by phone. (Id.) Neither Mr. Silva nor Mr. Primeaux (individually or through counsel) attended. (Id.) Mr. Styra called Mr. Primeaux's counsel and spoke with a case manager explaining that counsel was out of the office the week before the conference, and counsel was out sick that day. (Id.) The case manager agreed to forward the message to counsel. (Id.) An email from the case manager to counsel states that counsel "instructed me not to take their call and that we are not settling." (Doc. 44-38.)[2]  Once the conference was

---

[2] Mr. Primeaux disputes this "instruction" and points to counsel's deposition testimony that it was "false" Mr. Primeaux was never willing to settle his claim. (Doc. 48 at 13, ¶ 27; Doc. 48-3 at 22.) Had Progressive offered a settlement, one of Mr. Primeaux's attorneys "would've taken it to Mr. Primeaux . . . . It's [their] company policy whenever [they] have an offer." (Doc. 48-3 at 22; see also id. at 27–

underway, the passengers' injuries were summarized, largely as described above. (Doc. 44-12 at 71–72.) Given that Mr. Silva had not participated in the settlement process, all participants in attendance agreed to set aside $100 to resolve any claim he may have. (Id. at 72.) Mr. Billie originally sought $5,000 but agreed to $1,000 because he "would be happy to settle for less as [Ms. Joe] is his girlfriend and wants to resolve it." (Id.) Ms. Gonzalez's counsel at first refused to settle for anything less than $10,000, but eventually accepted $9,900. (Id.) "Faced with the ability to resolve 2 of the most serious [bodily injury] claims at mediation," Progressive decided it was in Ms. Joe's best interest to resolve Mr. Billie's claim for $1,000, Ms. Gonzalez's for $9,900, and Mr. Silva's for $100, and to allocate the remaining $9,000 to Mr. Primeaux. (Id. at 72–73.)

Progressive tendered a check for $9,000 to Mr. Primeaux on January 19, 2018. (Doc. 44-39 at 2.) Mr. Primeaux, however, sued Ms. Joe and secured a final judgment for $141,479.58 on December 19, 2019. (Doc. 44-42.) Mr. Primeaux then sued Progressive who removed the matter from Florida state court to this Court on November 30, 2020. (Doc. 1.) His operative pleading alleges a single claim for bad faith claims handling. (See Doc. 21.)

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 states that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

28.)

Civ. P. 56(a).  If this showing is made, "the burden shifts to the nonmoving party to come forward with specific facts showing that there is a genuine issue for trial." Shaw v. City of Selma, 884 F.3d 1093, 1098 (11th Cir. 2018) (quotation omitted).

"A fact is 'material' if it has the potential of 'affect[ing] the outcome' of the case."  Id. (citation omitted).  "And to raise a 'genuine' dispute, the nonmoving party must point to enough evidence that 'a reasonable jury could return a verdict for [him].'"  Id. (citation omitted).  "When considering the record on summary judgment 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  Id. (citation omitted).  "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence but is pure conjecture and speculation."  Daniels v. Twin Oaks Nursing Home, 692 F.2d 1321, 1324 (11th Cir. 1982) (internal quotation marks and citation omitted).

## DISCUSSION

The parties readily dispute whether Progressive handled Mr. Primeaux's claim in bad faith and whether its handling of that claim resulted in the excess judgment Mr. Primeaux secured against Ms. Joe.  The record contains evidence from which a reasonable jury could find that Progressive failed to fully investigate the severity of each passenger's injuries, resulting in an indiscriminate settlement based mostly on oral representations.  A jury could further find that Progressive's allocation of the policy limits, a decision informed by its allegedly deficient investigation, resulted in Mr. Primeaux's excess judgment.  Conversely, a jury

could also find that Progressive steadfastly tried to secure as much information as it could to resolve the multiple claims against Ms. Joe. Its decision to resolve Mr. Billie's claim for $1,000 and securing Ms. Gonzalez's release for less than she originally demanded—leaving $9,000 for Mr. Primeaux who did not attend the global settlement conference—may very well speak to Progressive's good-faith handling of the claims. This is all to say, that determination is one of fact and not law. Thus, Progressive's motion for summary judgment is due to be denied.

I. **Whether an insurer acted in bad faith is viewed under the totality of the circumstances**.

Under Florida law, insurers like Progressive "owe[] a fiduciary duty to act in [their insured's] best interests." Berges v. Infinity Ins. Co., 896 So. 2d 665, 677 (Fla. 2004). This good-faith duty "arises from the nature of the insurer's role in handling the claim on the insured's behalf." Harvey v. GEICO Gen. Ins. Co., 259 So. 3d 1, 6 (Fla. 2018). "[I]f an insurer [is] found to have acted in bad faith, the insurer would have to pay the entire judgment entered against the insured in favor of the injured third party, including any amount in excess of the insured's policy limits." State Farm Mut. Auto. Ins. Co. v. Laforet, 658 So. 2d 55, 58 (Fla. 1995).[3]

The "insurer has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." Harvey, 259 So. 3d at 6 (quotation omitted). It must "investigate the facts . . . and settle, if possible, where a reasonably prudent person, faced with the

---

[3] "Florida courts allow[] the injured third party to bring a bad faith action directly against the first party's insurer." Laforet, 658 So. 2d at 58.

prospect of paying the total recovery, would do so." Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783, 785 (Fla. 1980). The insurer may not rely on "a mere checklist," simply going through the motions of resolving a claim. Harvey, 259 So. 3d at 7. "Rather, the critical inquiry in a bad faith [action] is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." Id. The "question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard." Berges, 896 So. 2d at 680. In the end, "it is for the jury to decide whether the insurer failed to act in good faith with due regard for the interests of the insured." Harvey, 259 So. 3d at 7 (quotation omitted); see also Berges, 896 So. 2d at 680.

## II. There is a genuine dispute over Progressive's investigation of the passengers' injuries and its allocation of the policy limits.

Progressive begins by correctly noting that an insurer's decision to pursue a global settlement conference with multiple injured claimants complies with its duty of good faith as a matter of Florida law. (Doc. 44 at 16); Mesa v. Clarendon Nat'l Ins. Co., 799 F.3d 1353, 1360 (11th Cir. 2015). But this assertion is beside the point because the sole issue present is not whether Progressive acted in bad faith by "fail[ing] to immediately tender the $10,000.00 per person liability limits to" Mr. Primeaux. Mesa, 799 F.3d at 1360; (see Doc. 48 at 16–17.) Instead, the appropriate focus is whether Progressive acted as a reasonably prudent person (i.e., in good faith) when it decided to allocate $9,000 to Mr. Primeaux, $9,900 to Ms. Gonzalez, $1,000 to Mr. Billie, and $100 to Mr. Silva.

Florida does not impose an impossible standard here. Indeed, "where multiple claims arise out of one accident, the liability insurer has the right to enter reasonable settlements with some of those claimants, regardless of whether the settlements deplete or even exhaust the policy limits to the extent that one or more claimants are left without recourse against the insurance company." Farinas v. Fla. Farm Bureau Gen. Ins. Co., 850 So. 2d 555, 560 (Fla. 4th DCA 2003) (quotation omitted). Progressive even had the right "to settle certain claims to the exclusions of others, provided this decision [was] reasonable and in keeping with its good faith duty." Id. at 561. But its duty of good faith still required that Progressive "fully investigate all claims arising from a multiple claim accident," and "minimize the magnitude of possible excess judgments against the insured by reasoned claim settlement." Gen. Sec. Nat'l Ins. Co. v. Marsh, 303 F. Supp. 2d 1321, 1325 & n.17 (M.D. Fla. 2004) (citing Florida cases).

Progressive maintains that "given the injury information [it] had at the time," Ms. Gonzalez and Mr. Billie had serious and substantial injuries. (Doc. 44 at 22 (quoting Doc. 44-43 at 27).) It also notes that Mr. Primeaux ultimately was apportioned "$9,000 which was . . . 90 percent of the $10,000" policy limit. (Id. at 23 (quoting Doc. 44-45 at 20).) Be that as it may, the answer to whether this truly "was reasonable under the circumstances," as Progressive maintains, is not for the Court to decide on summary judgment given the record as it stands.

There is substantial evidence from which a jury may find that Progressive failed to act in good faith when it allocated Ms. Gonzalez $9,900 and Mr. Billie

$1,000, thereby precluding it from offering Mr. Primeaux $10,000 to settle his claim and avoid an excess judgment. A jury may credit Mr. Primeaux's counsel who testified that if Progressive "want[ed] to send us a check for $10,000, that's the ticket to close out the case." (Doc. 48-3 at 28.) A fact finder may reason that Progressive's decision was not based on an adequate investigation of the passengers' injuries given Mr. Styra's testimony that Progressive "had no information as to really the true extent of [Mr. Primeaux's] injuries and whether he was more injured than [Mr. Billie and Ms. Gonzalez]." (Doc. 44-45 at 20.) A jury may also favor Ms. Joe's testimony that she was not worried that Mr. Billie—her boyfriend—would have sued her over his injuries and that he was acting "goofy" at the hospital, downplaying the severity of what he claimed to Progressive. (Doc. 48-1 at 38.)

The record reflects that Progressive knew Mr. Primeaux had incurred $80,000 in medical expenses. And Mr. Primeaux therefore disputes Progressive's decision to allocate Ms. Gonzalez a higher payment—relying on a hospital lien, without reviewing medical records corroborating her injuries.[4] Mr. Styra also could have requested medical authorization to view a separate insurance file containing Mr. Primeaux's medical records. But he did not because he assumed Mr. Primeaux's counsel would provide that information at the global settlement

---

[4] Further illustrating that a jury must resolve the parties' dispute is Mr. Styra's testimony that "[he] did not doubt that [Mr. Primeaux had surgery], but [he would] still have to confirm that it actually happened." (Doc. 48-9 at 56.) But Mr. Styra had approximately the same amount of medical documentation for Mr. Primeaux's injury that he had for Ms. Gonzalez's (e.g., a hospital discharge report and notation in the claim file of $80,000 in medical expenses compared to a demand letter and hospital lien).

conference. (Doc. 48-9 at 23.) He also did not request authorization because of how soon the conference would occur and Mr. Styra "had not received any response from" Mr. Primeaux's counsel. (Id.) From this, a jury could determine the reasonableness of Progressive's investigation and, ultimately, its decision to allocate funds based on that investigation.

On the other hand, the record may also support a finding that Ms. Joe was an unreliable witness given how often Progressive tried to discuss the matter with her and her lack of active participation in the settlement conference. (See Doc. 44-12 at 74.) A jury may note that she told Progressive she could not contribute $1,000 toward settlement, otherwise ensuring Mr. Primeaux received the $10,000 he claims he would have accepted.[5] Given Mr. Primeaux and his counsel's lack of communication with Progressive, (see, e.g., id. at 71–75; Doc. 48-9 at 27, 35) and the real threat of litigation that Ms. Gonzalez's claim posed (Doc. 44-35), it may well be that Progressive acted in Ms. Joe's best interest in dividing the policy limits as it did.

But this is not a question the Court can answer at this stage when the evidence must be viewed in a light most favorable to Mr. Primeaux. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-

---

[5] Ms. Joe testified that she lacked the ability to contribute during the time of the accident though "could save up and try to contribute." (Doc. 48-1 at 20.) But Progressive did not follow up with her after the global settlement conference to discuss this viability of this approach. (Id.)

movant's evidence is to be accepted for purposes of summary judgment."). In sum, "there are many factual issues for the jury to resolve, including whether . . . settlement with three of the possible claimants was reasonable . . . [and] whether [Progressive] adequately investigated the facts of all of the claims" before distributing the policy limits. Farinas, 850 So. 2d at 561.

### III. Progressive's actions may have contributed to the excess judgment.

Next, Progressive argues that no reasonable jury could find that its claims handling resulted in Mr. Primeaux's excess judgment because he was unwilling to settle, even for the full policy limit of $10,000. (Doc. 44 at 24–25.) Any "damages claimed by an insured in a bad faith case must be caused by the insurer's bad faith." Harvey, 259 So. at 7. Put differently, "[t]here must be a causal connection between the damages claimed and the insurer's bad faith." Perera v. U.S. Fid. & Guar. Co., 35 So. 3d 893, 902 (Fla. 2010). At the same time, "the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." Berges, 896 So. 2d at 677. An insurer may still be found liable for bad faith even where the insured could have attempted to avoid the excess judgment through his own actions. See Harvey, 259 So. 3d at 8.

To be fair, Mr. Primeaux testified several times that he would not have accepted a settlement offer from Progressive. (See Doc. 44 at 25.) For example, he testified that he sued Ms. Joe because he wanted more than the $10,000 policy limit, he was unwilling to settle his claim after suing, and he would not have settled his claim had he attended the global settlement conference. (Doc. 44-46 at 13, 15,

- 14 -

17.)   But at the same time, a jury may view Mr. Primeaux's refusal (and credit his testimony) in the context of the $9,000 offer he eventually received.   The $9,000, Mr. Primeaux attested, "wasn't even the full amount" and that he would have settled for the "full amount," (i.e., $10,000).   (Id. at 16.)   When confronted with his answers about refusing to settle, Mr. Primeaux clarified that he "never got offered [$10,000] at all, so that's why I was never willing to settle.   It was always [$9,000] from the start.   I'm not taking [$9,000]."   (Id. at 19.)

Mr. Primeaux expressed frustration that he did not know how to communicate his settlement desires with his attorneys and he "didn't know nothing about this [process]."   (Id.)   To find that Mr. Primeaux would or would not have accepted settlement, particularly when he himself could not say whether he would have settled given that Progressive never offered him the full policy limit, requires the Court to usurp the jury's function.   The Court simply does not resolve "what-ifs" on summary judgment.   Progressive highlights the conflicting nature of Mr. Primeaux's testimony, pointing to his counsel's refusal to participate in the global settlement conference and lack of information exchanged between the parties.   It argues Mr. Primeaux's "alleged willingness to settle is unsupported by any piece of record evidence other than his self-serving and contradictory testimony that should be rejected by this Court."   (Doc. 49 at 7.)   This, however, goes to the weight of Mr. Primeaux's testimony; not whether a jury should consider it in the first place in reaching their own credibility determination.

Contrary to Progressive's assertion about the "contradictory" testimony, this

simply is not a situation "where a videotape . . . definitively established what happened and what did not." Sears v. Roberts, 922 F.3d 1199, 1208 (11th Cir. 2019) (explaining the very narrow circumstances in which a court can disregard a party's testimony as "blatantly contradicted by the record" (quoting Scott v. Harris, 550 U.S. 372, 380 (2007))). Progressive is essentially asking the Court to make an impermissible character determination, to weigh the conflicting evidence in other words, on summary judgment. The Court will decline Progressive's invitation. "While a jury ultimately may discredit [Mr. Primeaux's and his counsel's] testimony regarding the likelihood of settlement as inconsistent with [their] prior statements [or lack thereof] to Progressive, [the Court's] role at summary judgment is not to make credibility determinations or weigh the evidence." Aldana v. Progressive Am. Ins. Co., 828 F. App'x 663, 672 (11th Cir. 2020) (citing Mize, 93 F.3d at 742).

## CONCLUSION

At bottom, the answer to whether Progressive handled the claims against Ms. Joe in good faith or if its actions resulted in Mr. Primeaux's excess judgment is not for the Court to divine on summary judgment. A jury ultimately will have to decide which party has the better evidence—whose side presents the more believable witnesses—in resolving this dispute. But in light of the competing evidence before the Court, Progressive's motion for summary judgment (Doc. 44) is **DENIED**.

Having reviewed the entire summary judgment record in this case, the parties may want to consider engaging in settlement discussions. If the parties

choose to do so in good faith, the Court, upon filing of a joint notice, would be inclined to stay the case and all its deadlines.

**ORDERED** at Fort Myers, Florida, on August 8, 2022.

_____
JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE